## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **AMANDA JEWELL**<br><br>        **Plaintiff,**<br><br>    v.<br><br>**NEW ORLEANS PELICANS NBA, LLC**<br>**and NEW ORLEANS LOUISIANA**<br>**SAINTS, LLC**<br><br>        **Defendants.** | **CIVIL NO. 2:23-CV-637** |

## <u>COMPLAINT</u>

Plaintiff Amanda Jewell asserts her causes of action against defendants New Orleans Pelicans NBA, LLC and New Orleans Louisiana Saints, LLC as follows:

### THE PARTIES

1.     Plaintiff is Amanda Jewell.  She is 36 years old.  She lives and is domiciled in Luling, St. Charles Parish, Louisiana.  She is a Louisiana citizen.

2.     Defendant is New Orleans Pelicans NBA, LLC ("**the Pelicans**").  The Pelicans is a foreign limited liability company organized in Delaware, but is registered with the Louisiana Secretary of State, is headquartered in Metairie, and actively does business in Louisiana.

3.     Defendant is New Orleans Louisiana Saints, LLC ("**the Saints**").  The Saints is a foreign limited liability company organized in Delaware, but is registered with the Louisiana Secretary of State, is headquartered in Metairie, and actively does business in Louisiana.

## JURISDICTION AND VENUE

4.     The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 2000e-2 *et seq.* (Title VII); 42 U.S.C. § 2000e-3 *et seq.* (Title VII's anti-retaliation provision); 42 U.S.C. § 12111 *et seq.* (the Americans with Disabilities Act applicable to employment), and 42 U.S.C. § 12203 *et seq.* (the ADA's anti-retaliation provision), as more particularly set-out herein.

5.     The Court has supplemental, subject-matter jurisdiction over Ms. Jewell's state law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to her federal law claims that they form part of the same case or controversy, as more particularly set-out herein.

6.     The Court has personal jurisdiction over the Pelicans because it is limited liability company registered, headquartered, and actively doing business in Louisiana, and, through its registered agent for the service of process, is present within Louisiana at the time this suit commenced.

7.     Alternatively, the Court has personal jurisdiction over the Pelicans because it regularly transacts business in Louisiana and regularly employs Louisiana citizens, committed the unlawful employment acts in Louisiana giving rise to the causes of action in this case, and derives substantial revenue from its business activities in Louisiana.  Thus, the Pelicans has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

8.     The Court has personal jurisdiction over the Saints because it is limited liability company registered, headquartered, and actively doing business in Louisiana, and, through its registered agent for the service of process, is present within Louisiana at the time this suit commenced.

9.     Alternatively, the Court has personal jurisdiction over the Saints because it regularly transacts business in Louisiana and regularly employs Louisiana citizens, committed the unlawful employment acts in Louisiana giving rise to the causes of action in this case, and derives substantial revenue from its business activities in Louisiana.   Thus, the Saints has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

10.     Venue for Ms. Jewell's federal law claims is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII's venue provision) and 42 U.S.C. § 12117 (incorporating Title VII's venue provision in ADA cases) because (1) the unlawful employment practices alleged herein were committed in this judicial district (specifically, Jefferson and Orleans Parishes), (2) the employment records relevant to this action are found in this judicial district (specifically, Jefferson and Orleans Parishes), and (3) but for the unlawful employment practices, Ms. Jewell would still be employed in this district (specifically, Jefferson and Orleans Parishes).

11.     Venue for Ms. Jewell's supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because all defendants are susceptible to this

Court's personal jurisdiction in this forum.

12.     Alternatively, venue for Ms. Jewell's supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because defendants' unlawful acts giving rise to this lawsuit, as well as Ms. Jewell's resulting injuries and damages, occurred within this judicial district (specifically, Jefferson and Orleans Parishes) and, accordingly, a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PROCEDURAL AND STATUTORY REQUIREMENTS

13.     The Pelicans employed more than 15 employees every week of 2020, 2021, and 2022.

14.     To the best of Ms. Jewell's estimation, the Pelicans employed more than 201 employees every week of 2020, 2021, and 2022.

15.     The Saints employed more than 15 employees every week of 2020, 2021, and 2022.

16.     To the best of Ms. Jewell's estimation, the Saints employed more than 201 employees every week of 2020, 2021, and 2022.

17.     Accordingly, the Pelicans and the Saints are each covered employers under the ADA and Title VII.

18.     As alleged further in this complaint, the Pelicans and Saints constitute a single, integrated employer with respect to Ms. Jewell's employment and her ADA and Title VII claims.

19.     As alleged further in this complaint, at the very least, the Pelicans and Saints

were Ms. Jewell's joint employer throughout her entire employment.

20.     Specifically, the Saints and Pelicans had previously entered into a Shared Services Agreement, and, pursuant to that agreement, the Pelicans loaned Ms. Jewell to the Saints throughout her entire employment, such that she sold premium seats and otherwise performed her job responsibilities under the direction and for the benefit of both the Pelicans and the Saints.

21.     As alleged further in this complaint, the Pelicans paid Ms. Jewell her wages, but she was ultimately controlled, directed, and performed work for both the Pelicans and the Saints.

22.     The Saints/Pelicans hired Ms. Jewell as a Premium Seating Account Executive around March 15, 2021.

23.     The Pelicans/Pelicans constructively terminated Ms. Jewell's employment around November 29, 2021 when it placed her on involuntary, indefinite, and unpaid leave.

24.     The Pelicans/Saints purported to formally terminated Ms. Jewell's employment around March 18, 2022.

25.     On April 28, 2022, within 180 days of both her constructive and formal termination, Ms. Jewell through her attorney timely filed an EEOC Charge of Discrimination with the EEOC New Orleans Field Office alleging both the Pelicans and the Saints unlawfully terminated Ms. Jewell's employment based on religion, disability, and retaliation for engaging in protected activities (EEOC Charge Nos. 461-2022-01555 (re the Pelicans) and 461-2022-01556 (re the Saints)).

26.    On November 22, 2022, the EEOC issued Ms. Jewell a Notice of Right to Sue for each of her Charges.

27.    Ms. Jewell timely filed this federal lawsuit within 90 days of receiving the EEOC's Right to Sue letters.

## FACTS

### A.    The Plaintiff – Ms. Amanda Jewell

28.    Amanda Jewell is a careerlong sales and business woman.  She lives with her husband and children in Luling, Louisiana.  Her family depends in part on Ms. Jewell's wages to support themselves.

29.    Relevant to the facts of this case, Ms. Jewell suffers from a medical disability that affects her immune system.

30.    Relevant to the facts of this case, Ms. Jewell is a Christian who adheres to what she describes as a Christian worldview.  Ms. Jewell holds a sincere religious belief that she was spiritually prohibited from receiving any of COVID-19 vaccinations available during her employment in this case.

### B.    Ms. Jewell's Disability

31.    Ms. Jewell suffers from a physical disability and related impairments.  These impairments substantially limit many of Ms. Jewell's life activities both inside and outside of work.

32.    Specifically, and since 2019, Ms. Jewell has suffered from what her physicians have described as a rheumatological or other immunological disorder that causes Ms. Jewell to suffer periodic and severe inflammation of her joints, significant swelling,

and significantly impaired mobility (hereinafter, Ms. Jewell's "medical disorder"). Ms. Jewell experiences these symptoms episodically. During a flare-up, Ms. Jewell's joints swell, she experiences related discomfort, and she has difficulty walking normally or more than short distances at a time. During a fare-up, Ms. Jewell often uses a cane to walk.

33. To date, Ms. Jewell has treated with multiple rheumatologists, endocrinologists, primary care physicians, and other medical specialists to arrive at a formal diagnosis and treatment plan.

34. Unfortunately, to date, Ms. Jewell's illness or disorder has not been formally diagnosed with certainty.

35. Nevertheless, it is medically undisputed that Ms. Jewell suffers from some apparent rheumatological or immunological condition that causes her physical impairments and substantially limits her major life activities by causing her swelling, discomfort, and impaired mobility compared to a non-disabled person.

36. Relevant to this case, one of Ms. Jewell's treating physicians was Dr. Carin Sanchez, MD. On November 5, 2021, Dr. Sanchez opined in a medical note that Ms. Jewell was recommended to "delay vaccinations of any kind including the Covid vaccine for a few months until the workup, diagnosis, and treatment plan [for her medical disorder] can be established."

37. This was the not the first time Ms. Jewell abstained from certain medical treatments because of her medical disorder. For instance, Ms. Jewell's treating gynecologist recommended she abstain from hormonal birth control to avoid

aggravating her disorder, and Ms. Jewell has done so.  Likewise, Ms. Jewell has twice before suffered adverse reactions to other vaccination products that required treatment at the local emergency room – once after receiving the Gardasil vaccination, and once after receiving the Tetanus, Diphtheria, Pertussis vaccination.

38.    Ms. Jewell has changed her diet, her routine, has abstained from hormonal birth control, has abstained from any vaccinations including for the SARS-CoV-2 virus, and has generally changed how she lives her life to try and treat and manage her medical condition.

**C.    Ms. Jewell's Religious Beliefs**

39.    Ms. Jewell holds the sincere religious belief that good and evil exist, and she is spiritually obligated to do good and spiritually prohibited from doing evil.

40.    Ms. Jewell sincerely believes that all iterations of the SARS-CoV-2 vaccine available during her employment were spiritually evil because, in her assessment, each was derived, researched, or tested using fetal cell lines harvested from human biological material without consent.

41.    Ms. Jewell thus regarded receiving any of these vaccine products as spiritually akin to participating in the sin of abortion.

42.    Because Ms. Jewell believes that abortion in that context was evil, her religious beliefs prohibited her from receiving any iteration of the then-available SARS-CoV-2 vaccine products.

**D.    The Defendants – the Pelicans and the Saints**

43.    The Pelicans are a club of the National Basketball League.

44.     The Saints are a club of the National Football League.

45.     For purposes of Ms. Jewell's ADA and Title VII causes of action in this case, the Pelicans and the Saints constitute a single, integrated enterprise (hereinafter, the "**Pelicans/Saints**" entity), and Ms. Jewell was employed by the Pelicans/Saints entity throughout her entire employment.

46.     The object of the Pelicans/Saints enterprise is to grow and manage their conglomerated sports and entertainment business.

47.     For instance, both the Pelicans and Saints appear to be ultimately owned and controlled by a single owner, Gayle Benson.

48.     The Pelicans and Saints share a joint headquarters located in Metairie, Louisiana.

49.     Relevant to this case, throughout Ms. Jewell's employment, the Pelicans and the Saints shared a Vice President of Human Resources, a man named Patrick McKinney.  The Pelicans and the Saints also shared a Human Resources Manager, a woman named Kelley Stevenson.

50.     The Saints and Pelicans also appear to be jointly managed by many other officers, including their shared President, a man named Dennis Lauscha.

51.     The Pelicans and Saints also entered into a "Shared Services Agreement" whereby employees of one entity are borrowed and loaned to the other entity, are directed and controlled by both entities, and do work for the benefit of both entities.

52.     It appears that the Saints and Pelicans borrow and loan each others' employees on an indefinite basis, such that employees of one entity are, for all factual and

practical purposes, employees of both entities.  For instance, employees of either entity frequently refer to themselves as employees of both the Pelicans and the Saints.

53.     To the best of Ms. Jewell's understanding, and based on these and other facts, the Pelicans and Saints are owned and managed as a single, integrated enterprise, the object of which is to further the enterprise's conglomerated sports and entertainment business.

54.     At the very least, for purposes of plaintiff's ADA and Title VII causes of action, the Pelicans and Saints were Ms. Jewell's joint employer throughout her entire employment.

55.     In addition to their Shared Services Agreement, the Pelicans/Saints management described Ms. Jewell as a Premium Seating Account Executive for both the Pelicans and the Saints.  Ms. Jewell sold tickets and premium seating for both the Pelicans and the Saints.  Ms. Jewell's supervisors and managers also described themselves as employees of both the Pelicans and Saints.

56.     Finally, the shared Vice-president of Human Resources for the Pelicans/Saints, Patrick McKinney, is the person that notified Ms. Jewell she had been constructively terminated.  Later, the shared Human Resources Director for the Pelicans/Saints entity, Kelly Stevenson, is the person that notified Ms. Jewell her employment had been terminated again.

57.     To the best of her understanding, the decision to constructively and then formally terminate Ms. Jewell's employment was a shared and joint decision of the

Pelicans/Saints entity.

**C.    Ms. Jewell Excels at Her Position with the Saints/Pelicans**

58.    Ms. Jewell was hired as Premium Seating Account Executive around March 15, 2021.

59.    When she was hired, all account executives worked from home because of the COVID-19 pandemic in the United States.

60.    Ms. Jewell objectively excelled in her sales duties.   At the time of her constructive termination in November 2021, Ms. Jewell was ranked the third highest-grossing salesperson among thirty or so Pelicans/Saints premium account executives. This is despite the fact Ms. Jewell also took an approved maternity leave during this time.

61.    Ms. Jewell did so well at her job that the Pelicans/Saints entity rewarded her with expensive gifts and other recognitions for her sales efforts.

62.    Ms. Jewell was never disciplined or reprimanded at work.

63.    Ms. Jewell was objectively excellent at her job.

64.    No rational employer would have terminated Ms. Jewell's employment under the circumstances of this case absent an unlawful and discriminatory motive.   The Pelicans/Saints are, at bottom, in the business of selling tickets to their games.   Ms. Jewell was, objectively, one of the Pelicans/Saints' best salespeople in that regard.   As alleged throughout this complaint, the Pelicans/Saints lacked any legitimate, non0-discriminatory business reason for terminating Ms. Jewell's employment.

11

**E.    The Pelicans/Saints Response to COVID-19 Prior to the Availability of Vaccinations**

65.    The respiratory disease known as COVID-19 is caused by the Severe Acute Respiratory Syndrome Coronavirus 2 ("SARS-CoV-2") and its many variants.

66.    The U.S. Centers for Disease Control ("CDC") reported the first laboratory-confirmed case of COVID-19 in the United States on January 20, 2020.

67.    By the week of August 12, 2020, the CDC reported a total of slightly more than 5 million confirmed cases of COVID-19 nationwide.

68.    During this time, before any COVID-19 vaccine became available, the Pelicans/Saints continued to perform all its operations, whether requiring its employees to physically come to work, or work remotely, or through a blend of the two.  Specifically relevant to this case, the Pelicans/Saints continued sell tickets and premium seats to their games and required Ms. Jewell and her colleagues to perform all their responsibilities remotely via telework, which they did successfully.

69.    Beginning in October 2020, the Saints began allowing ticket holders to attend NFL games in person at the Superdome.

70.    The Saints required many of its employees to return to work at the Superdome during game time to service the needs of these ticket holders.

71.    The Saints/Pelicans enacted several work-place precautions that they apparently determined were safe enough to allow their employees to interact directly with ticket holders during Saints games and continue performing their job responsibilities without unreasonable risk of infection.

72.    Among those precautions were social distancing from one another when

possible and the use of face coverings.

73. Using these precautions, the Pelicans/Saints apparently determined their employees did not present a direct threat of infection to each other.

74. Importantly, during these 2020 season games, despite requiring other employees to return to work, the Saints did not require Ms. Jewell or her fellow account executives to return to the Superdome to sell tickets. Instead, management only required the sales executive staff, on a rotating basis, to come to the venue to socialize with guests and remind them to wear masks unless they were eating or drinking.

75. Selling tickets in person during Saints or Pelicans games was never an essential job responsibility of Ms. Jewell's position. None of these social activities were essential job responsibilities of Ms. Jewell's position.

76. Furthermore, the Saints did not require that ticket holders be vaccinated to attend Saints games or interact with any employees at the Superdome.

77. Instead, the Saints permitted ticket holders to attend games so long as they complied with City of New Orleans regulations at the time that required attendees to test negative on a PCR or antigen COVID-19 test prior to entry.

78. Likewise, beginning in December 2020, the Pelicans also allowed ticket holders to attend NBA games in person at the Smoothie King Center.

79. The Saints/Pelicans entity likewise required many employees to physically return to work during game and did not require vaccination.

80. The Saints/Pelicans entity likewise did not require Ms. Jewell or her fellow

account executives to sell tickets at the Smoothie King Center during game time, because selling tickets in person was never an essential job responsibility of Ms. Jewell's position.

81.    The Saints/Pelicans likewise did not require ticket holders to be vaccinated to attend games, instead requiring them to adhere to City of New Orleans regulations at the time, which required testing negative on a PCR or antigen COVID-19 test.

82.    Throughout this entire time, both with respect to the Pelicans and Saints entities, management apparently considered it safe enough for some employees to physically return to work despite the lack of any mandatory COVID-19 vaccination policy.

## F.    The Pelicans/Saints Enact a COVID-19 Vaccination Policy That Does not Include any Exemption Based on Medical Disability or Religious Objection

83.    By way of background: around December 11, 2020, the FDA granted emergency use authorization for the first publicly available COVID-19 vaccination in the United States manufactured by Pfizer.

84.    The CDC reports that as of June 1, 2021 the COVID-19 "B.1.617.2 / 'Delta' variant" had become the "dominant variant in the U.S."[1]

85.    The CDC reports that as of July 30, 2021, "The early data showing high viral loads in people infected with the Delta variant of COVID-19 suggest a concern that, unlike with other variants, vaccinated people infected with Delta can transmit the

---

[1] The CDC publishes a "COVID-19 Timeline" on its website which includes these facts.  The site may be accessed here: https://www.cdc.gov/museum/timeline/covid19.html

virus to others."[2]

86.     Around August 23, 2021, the FDA granted full approval to the first publicly available COVID-19 vaccination in the United States manufactured by Pfizer.

87.     *The Lancet* medical journal reported on October 29, 2021 that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts."[3]

88.     In August 2021, the Pelicans/Saints enacted a COVID-19 vaccination policy.

89.     Under the policy, all employees were required to receive any of the available COVID-19 vaccinations as a condition of employment.

90.     Although the Pelicans/Saints indicated that exemptions from the policy could be made based on religious objection or medical disability, this was not true at least with respect to Ms. Jewell's account executive position, and apparently untrue with respect to all other employees.  As discussed further below, Pelicans/Saints Vice-president of Human Resource Patrick McKinney told Ms. Jewell that management was terminating all employees who could not receive a COVID-19 vaccination.

91.     Ms. Jewell was pregnant when the Pelicans/Saints hired her, and she took approved medical leave after giving birth.  Prior to her formal leave, Ms. Jewell experienced complications from her pregnancy, specifically vasovagal syncope, which

---

[2] *Id.* at https://www.cdc.gov/museum/timeline/covid19.html
[3] Anika Singanayagam, et al., *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study*, THE LANCET (Oct. 29, 2021).  A copy of the article may be accessed here:  https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext

made it more likely Ms. Jewell could faint or fall while walking at work.  Management responded to these concerns by permitting Ms. Jewell to work from home, such that she was not even required to attend games to socialize with ticket holders and ask guests to wear their masks.  Again, none of these sorts of activities were essential responsibilities of Ms. Jewell's position.  Again, before Ms. Jewell told management she could not receive a COVID-19 vaccination and requested accommodation, management permitted Ms. Jewell to fully telework from home.  Again, despite her telework, Ms. Jewell was, objectively, one of the Pelicans/Saints highest-grossing salepeople.

92.   After giving birth to her son, Ms. Jewell was scheduled to return to work from maternity leave on October 5, 2021.

93.   Prior to her return to work, Ms. Jewell told her immediate supervisor that she had been advised against receiving any of the currently available COVID-19 vaccinations pending further diagnosis of her medical condition.  Ms. Jewell initially requested an exemption from the Pelicans/Saints policy based on that reason.

94.   Pelicans/Saints Vice President of Human Resources, Patrick McKinney, scheduled a conference call with Ms. Jewell to discuss the matter further.

95.   Around October 6, 2021, Ms. Jewell had that conference call with the McKinney.  Also on the call was the Pelicans/Saints Benefits Manager, a woman named Mary Vinet.

96.   McKinney began the conversation by telling Ms. Jewell he was aware "that you had some complications [and] that your doctor was saying to hold off [on receiving a

COVID-19 vaccination].”

97.    Ms. Jewell responded that was true, and that she had been suffering from her medical condition for about the past two years.

98.    McKinney interrupted Ms. Jewell and told her, explicitly, “I don’t think Mary [Vinet] and I, either one, want to go into your medical records.  It’s just, so, so, let me tell you where we stand, just so you understand. So, so, in order to return to the workplace, you must be vaccinated.  Period.  And based on your job, your job requires you to be vaccinated because, to be in front of people and stuff.”

99.    McKinney told Ms. Jewell that if she only needed a “short” extension of time to receive a COVID-19 vaccination, management would permit her to continue working from home for that period of time.  McKinney specifically told Ms. Jewell management would grant her another 6 weeks to receive a COVID-19 vaccination.

100.    But McKinney said if Ms. Jewell needed a longer extension of time to vaccinate, then the Pelicans/Saints would need to “take that in front of the Ochsner group that advises us to tell us is that a legitimate concern with the vaccine.”

101.    But, even then, McKinney was blunt, telling Ms. Jewell: “if [your doctor] comes back and says you cannot take the vaccine at all . . . then it’s going to be impossible for you to continue your employment with us.”

102.    McKinney likewise told Ms. Jewell management was, apparently, terminating all employees who could not receive a COVID-19 vaccination, telling her explicitly “we are releasing those employees that are not vaccinated.”

103.    Throughout the entire call, although she was alarmed at what McKinney was

telling her, Ms. Jewell attempted to remain professional and amiable, and was hopeful she could somehow work out a solution with management.

104.   Ms. Jewell also had a sincerely held religious objection to receiving any of the available COVID-19 vaccinations at the time, but she did not raise the issue during the call because, first, like most Americans she did not want to tell her employer about her personal religious beliefs unless necessary, and, second, McKinney bluntly told Ms. Jewell she would be fired if she could not receive the COVID-19 vaccination.

105.   Ultimately, the Pelicans/Saints enacted a COVID-19 vaccination policy that applied to Ms. Jewell, her fellow account executives, and apparently all other employees, but which included no exemptions based on religious objection under Title VII or medical disability under the ADA.  Any suggestion by the Pelicans/Saints otherwise appears to have been pretext to give fabricated cover of complying with federal and Louisiana state law, when in reality the Pelicans/Saints had enacted a discriminatory policy on its face.

## G.   The Pelicans/Saints Constructively Terminate Ms. Jewell Because of Her Disability, Religion, and Protected Activities

106.   After her October 6 conference call, Ms. Jewell had a regularly scheduled appointment with her treating gynecologist, who was aware of Ms. Jewell's medical condition, and Ms. Jewell asked her thoughts about abstaining from the COVID-19 vaccine.

107.   The gynecologist was employed or otherwise affiliated with Ochsner Health. The gynecologist implied she agreed that Ms. Jewell should abstain for the time being from receiving any of the COVID-19 vaccinations, but told Ms. Jewell Ochsner Health

did not permit any of its physicians to take any position that a patient should not receive a COVID-19 vaccination.  Ms. Jewell's physician implied she was forbidden from even revealing that much information to a patient.

108.   Startled by this information, Ms. Jewell treated with another physician outside of the Ochsner Health system, Dr. Carin Sanchez, M.D.

109.   Dr. Sanchez ordered several diagnostic tests of Ms. Jewell to try and arrive at a formal diagnosis and treatment plan for her medical condition.  Pending further evaluation, Dr. Sanchez recommended Ms. Jewell not receive any new vaccination against any illness, including against COVID-19, for the time being.

110.   In the meantime, based on her prior conversation with McKinney that the Pelicans/Saints would terminate any employee who did not receive a COVID-19 vaccine regardless of the reason, Ms. Jewell sought legal counsel on the matter.

111.   On October 28, 2021, Ms. Jewell through legal counsel formally wrote to McKinney that she was currently unable to comply with the Pelicans/Saints vaccination rule because of her medical disability under the ADA and because she held a sincere religious objection to receiving the vaccine under Title VII.

112.   Ms. Jewell's letter was explicitly "collaborative rather than confrontational." Ms. Jewell described the nature of her medical disability and current recommendation to abstain from receiving any vaccination for the time being, explaining:

> Amanda gives notice that she currently suffers from what her treating physicians believe is an immune disorder not yet otherwise specified. Amanda's immune disorder causes episodic but severe inflammation to her joints, significant swelling, and significantly impaired mobility. In

other words, Amanda suffers from a physiological impairment affecting her immune system, and that impairment causes discomfort, swelling, and difficulty walking and related movement.

Likewise, because Amanda's current treating physicians do not yet understand what conditions or stimuli trigger her immune reactions, Amanda's primary treating physician, Dr. Carin Sanchez, M.D., recommends that Amanda not receive any COVID-19 vaccine (along with various other therapies) pending the results of further medical testing. In that sense, Amanda's immune impairment also causes (or might cause) her to react negatively to any COVID-19 vaccine, which further defines her current disability.

113.   Ms. Jewell also put the Pelicans/Saints on notice of her sincerely held religious objection to their vaccination policy, explaining:

Amanda's religious belief is that all iterations of the currently available COVID-19 vaccine are spiritually evil because they are each derived, researched, or tested using fetal cell lines, harvested from human biological material without consent. Accordingly, Amanda's religious belief is that receiving any of these vaccines is akin to participating in the sin of abortion. Because Amanda ranks abortion in this specific context as evil, her religious belief prohibits her from receiving any iteration of the currently available COVID-19 vaccine.

114.   Ms. Jewell asked for a reasonable accommodation to the Pelicans/Saints COVID-19 vaccination policy under both the ADA and Title VII. Ms. Jewell requested "*any* reasonable accommodation that the Saints and Pelicans can provide without undue hardship to permit her to continue in her position" (emphasis in original).

115.   Ms. Jewell likewise suggested the following, four accommodations:

"1.   Compliance with the City of New Orleans' current vaccine mandate, which requires periodic PCR or antigen testing before entering any sports facility or arena within Orleans Parish;

2.   Otherwise, submitting to periodic PCR or antigen testing before entering any work facility outside of Orleans Parish;

     3.     Use of approved facemask coverings when inside buildings or other required spaces; and,

     4.     Any other reasonable precaution requested by the Pelicans or Saints."

116.   None of these reasonable accommodations would have imposed any undue burden or hardship on the Pelicans/Saints.  In fact, submitting to periodic PCR or antigen testing at her own expense, along with using approved face coverings like an N95 maks, would have ensured that Ms. Jewell remained free of infection when at work to an even greater extent than her vaccinated colleagues who were not subject to testing requirements.

117.   For instance, as reported by the American Medical Association, a properly fitted N95 facemask prevents penetration of an infectious dose of COVID-19 virus particles for hundreds of hours of use.[4]

118.   Further, at the time that management constructively terminated Ms. Jewell on November 29, 2021, the CDC had already reported for months that people vaccinated against COVID-19 were nevertheless capable of transmitting the prevalent, so-called "Delta variant" of the SARS-CoV-2 virus.[5]

119.   These facts combined, submitting to periodic COVID-19 testing plus the use of approved and effective facemasks would have ensured Ms. Jewell posed a lesser risk of infection or transmission of the COVID-19 virus versus her vaccinated peers who

---

[4] The American Medical Association publishes a recurring series called "What Doctors Wish Patients Knew."  These facts were reported by the AMA in its June 24, 2022 edition entitled "What doctors wish patients knew about wearing N95 masks."  A copy of the edition may be accessed here: https://www.ama-assn.org/delivering-care/public-health/what-doctors-wish-patients-knew-about-wearing-n95-masks

[5] *Id.* at https://www.cdc.gov/museum/timeline/covid19.html

were not required to submit to periodic COVID-19 testing at the time.

120.    Moreover, based on Ms. Jewell's understanding, management did not require sales executives to return to the office until May 2022.  Management obviously could have accommodated Ms. Jewell by simply allowing her (apparently like all other account executives) to continuing teleworking at the time.

121.    Again, these proposed accommodations would have caused zero burden to the Pelicans/Saints, zero cost to the Pelicans/Saints, and zero risk to the Pelicans/Saints or its employees.  Any suggestion by management otherwise is mere pretext to cover up their discriminatory motive.

122.    After receiving Ms. Jewell's protected request for reasonable accommodation, Patrick McKinney began corresponding with Ms. Jewell by email.    The Pelicans/Saints ultimately refused to provide Ms. Jewell with any reasonable accommodation whatsoever.

123.    On November 5, 2021, Ms. Jewell did forward McKinney a medical note from Dr. Sanchez opining that she should abstain from receiving any vaccination for the time being, including any COVID-19 vaccination, explaining:

> I am writing this letter on behalf of my patient, Amanda Milano Jewell.  I am her primary care physician.  She has been having medical issues for which we are in the process of working up.  Her immune system has been affected by this condition.  Because of the ongoing testing, it has been advised to delay vaccinations of any kind including the Covid vaccine for a few months until the workup, diagnosis and treatment plan can be established.  Please do not hesitate to contact me for any questions or concerns.

124.    On November 9, 2021, Ms. Jewell provided McKinney with Dr. Sanchez's full contact information and offered to provide a HIPAA release in favor of the

Pelicans/Saints so they could obtain her medical records from Dr. Sanchez's office for the purpose of engaging in the interactive process in good faith. McKinney never accepted the offer and, to the best of Ms. Jewell's knowledge, never contacted Dr. Sanchez's office about Ms. Jewell's medical condition.

125. This is, of course, because McKinney had already told Ms. Jewell during their October 6, 2021 meeting that if she needed a longer extension of time to receive a COVID-19 vaccine, or could not receive one at all, then she would be fired.

126. In other words, the Pelicans/Saints never engaged in the interactive process with Ms. Jewell to determine a reasonable accommodation for her medical disability because the Pelicans/Saints had already decided, at a policy level, for whatever reason, to fire all employees who could not receive a COVID-19 vaccination regardless of their medical disability under the ADA or religious objection under Title VII.

127. In other words, everything that the Pelicans/Saints said and did beginning from their October 6, 2021 call with Ms. Jewell until they fired her was mere pretext to cover up for their unlawful discrimination.

128. Finally, on November 19, McKinney emailed Ms. Jewell and constructively terminated her by placing her on involuntary, unpaid, indefinite leave. McKinney explicitly misconstrued the nature of Ms. Jewell's medical condition to pretextually justify management's decision by asserting Ms. Jewell was "immunocompromised," writing:

> If you are unvaccinated, ***immunocompromised***, and in close proximity to others, we have concerns over you getting infected (and it being a severe case) or you unwittingly transmitting the virus to others. (emphasis added)

129.   McKinney also indicated that, for the same reason, the Pelicans/Saints were denying Ms. Jewell's request for reasonable accommodation based upon her religious objection under Title VII.

130.   First, Ms. Jewell never indicated that she was immunocompromised.  More specifically, Ms. Jewell never indicated that her medical condition made her more susceptible to infection or greater illness because of COVID-19.  Ms. Jewell is not, in fact, immunocompromised, at least not in the sense that McKinney used the word. None of the medical information provided by Ms. Jewell to the Pelicans/Saints indicated she was immunocompromised.   Had the Pelicans/Saints bothered contacting Dr. Sanchez's office as Ms. Jewell explicitly offered, they would have learned she was not immunocompromised in the sense McKinney asserted.

131.   Second, back during their October 6, 2021 conference call, McKinney told Ms. Jewell that if she presented a medical basis to abstain from the COVID-19 vaccination, then the Pelicans/Saints would consult with Ochsner Health regarding the matter.  The Pelicans/Saints apparently never did so.

132.   McKinney admitted this to Ms. Jewell by email on December 1, 2021.  There, Ms. Jewell specifically asked McKinney on what basis management had determined it was unsafe for her to physically return to work.  McKinney responded "The basis for our assessment includes Dr. Sanchez's note, relevant CDC guidance, and your essential job functions."  McKinney did not assert the Pelicans/Saints ever contacted Ochsner, or any other medical provider, regarding an individualized assessment of whether it was safe for Ms. Jewell to return to work under any accommodation.

133.   In a later email dated March 8, 2022 (explained further below), the Pelicans/Saints Human Resources Manager, Kelly Stevenson, further admitted to Ms. Jewell that management's decisions were not made by engaging with any medical professionals, but instead were "typically made by the Human Resources Department, sometimes in consultation with legal counsel."

134.   Third, nothing in Dr. Sanchez's medical note restricted Ms. Jewell from returning to work or indicated she was "immunocompromised," or that she was at greater risk to transmit or become more seriously ill from COVID-19.  McKinney did not reference the specific "relevant CDC guidance" management allegedly relied upon, and Ms. Jewell is unaware of any CDC "guidance" that opined on the workplace safety of a person with a rheumatological or immunological disorder that causes swelling, pain, and impaired mobility versus a non-disabled person in the context of COVID-19, or that passes on the safety of such an individual returning to work given the use of periodic COVID-19 testing and the use of approved face coverings like N95 masks.   Finally, McKinney did not specify which of Ms. Jewell's "essential job functions" he meant, and, in fact, physically coming to work on game days was not an essential job responsibility of Ms. Jewell's account executive position.

135.   Based on these facts, the Pelicans/Saints arrived at unreasonable and objectively unsupported medical conclusions about Ms. Jewell's health without consulting with any reasonable medical providers or authorities.  The Pelicans/Saints refused to make an individualized assessment of Ms. Jewell's medical disability and the possible reasonable accommodations that would have permitted her to continue

to work.  The Pelicans/Saints admitted as early as their October 6, 2021 conference call with Ms. Jewell that it intended to fire any employee who could not receive a COVID-19 vaccination, and from that point onward the Pelicans/Saints refused to engage in any bona fide, interactive process with Ms. Jewell.  The Pelicans/Saints likewise rejected the possibility of any reasonable accommodation to her religious objection under Title VII based on management's identical, unreasonable, and objectively unsupported conclusions.

136.   Additionally, management's purported concerns about Ms. Jewell's safety are objectively pretext for discrimination because management never prohibited Ms. Jewell from attending games at the Superdome or Smoothie King Center as a ticket holder.  Meaning, in other words, while management claimed it was unsafe for Ms. Jewell to physically interact with people on game days for ***work***, management never restricted Ms. Jewell from physically interacting with people on game days as a ***ticket holder***, either before or after management placed Ms. Jewell on involuntary, unpaid, and indefinite leave.  In reality, the Pelicans/Saints simply held animus against Ms. Jewell based on her disability, her record of disability, or because McKinney and other management admittedly regarded Ms. Jewell as "immunocompromised" in a way in which she was not.

137.   In reality, the Pelicans/Saints simply held animus against Ms. Jewell based on her religious beliefs and practices.

138.   In reality, the Pelicans/Saints simply held animus against Ms. Jewell because she asked, through her legal counsel, for a reasonable accommodation to the

Pelicans/Saints vaccination rule.

## H.   Alternatively, the Pelicans/Saints Refused to Accommodate Ms. Jewell Because of Sponsorship Concerns with Ochsner Health

139.   In the alternative, even if the Pelicans/Saints did not hold animus against Ms. Jewell based on her disability or religion, the Pelicans/Saints refused to reasonably accommodate her disability and religious objections because of client-relation concerns surrounding Ochsner Health's sponsorship of both the Pelicans and the Saints.

140.   More specifically, and based on publicly available information, Ochsner Health has been the official "Healthcare partner" of the Pelicans and Saints since at least 2017.   Among other items, Ochsner Health purchased the naming rights to the Pelicans and Saints training facility, now known as the "Ochsner Sports Performance Center."[6]   In November 2022, the President of the Pelicans and Saints, Dennis Lauscha, was elected to the Ochsner Health Board of Directors.[7]   Patrick McKinney previously advised Ms. Jewell during their October 6, 2021 conference call that the Pelicans/Saints were, apparently, consulting with Ochsner Health regarding management's COVID-19 vaccination rule.

141.   As early as August 2020, it appears the Pelicans/Saints directed players to engage in social media and other public appearances praising Ochsner Health "for

---

[6]  *See* "Home of the training facility for the New Orleans Saints and Pelicans" at https://www.ochsner.org/lp/sponsorships

[7]  *See* "Saints, Pelicans President Dennis Lauscha Elected to Ochsner Health Board of Directors" at https://news.ochsner.org/news-releases/saints-pelicans-president-dennis-lauscha-elected-to-ochsner-health-board-of-directors

the impact they've made during the COVID-19 Pandemic.[8]  In March 2021 (before the FDA had given full approval to any COVID-19 vaccine product), the Pelicans, were the first NBA team to announce at least some of their players would receive a COVID-19 vaccination.[9]  The pelicans advertised this to media, stating "The Pelicans and Ochsner Health will continue to team up to create [Public Service Announcements] and educational programming to raise awareness about the safety and efficacy of the COVID-19 vaccine and to highlight the power of large-scale vaccination in our community in an effort to end the COVID-19 pandemic."[10]  These sorts of public marketing advertisements between the Pelicans/Saints and Ochsner Health appear to have been routine during the pandemic.

142.    Beginning in April 2021, Ochsner Health and the Pelicans publicly advertised that it would "host multiple COVID-19 vaccination events at upcoming Pelicans home games at the Smoothie King Center."[11]  For multiple games thereafter, "Anyone who is 16 years of age or older is eligible to receive the Pfizer vaccine in Louisiana" during game time.[12]

143.    Based on her experience in sales and business and informed by the publicly

---

[8]  *See* "Josh Hart surprises Ochsner healthcare workers | New Orleans Pelicans" at
https://www.youtube.com/watch?v=D3uhytOFsC8

[9]  *See* "I feel lucky: Hope as first NBA team gets COVID-19 vaccine" at
https://au.sports.yahoo.com/nba-new-orleans-pelicans-vaccine-adam-silver-nicolo-melli-sindarious-thornwell-234540824.html

[10]  *See* "Multiple New Orleans Pelicans players receive first found of vaccine" at
https://www.nola.com/sports/pelicans/article_58fea36c-84e5-11eb-8ac4-93eb2b15ca2e.html

[11]  *See* "Ochsner Health to host COVID-19 vaccination events at upcoming Pelicans games"
at https://www.nba.com/pelicans/news/ochsner-health-host-covid-19-vaccination-events-upcoming-pelicans-games

[12]  *Id.*

available information on the issue, Ms. Jewell alleges Ochsner Health paid a significant amount of money to the Pelicans/Saints for these advertising and marketing opportunities.

144.   In turn, based on publicly available information, it appears Ochsner Health was eligible to receive payment from Medicare between $16.94 and $40.00 per COVID-19 vaccination Ochsner administered to eligible people.[13]  It appears Ochsner was eligible to receive payment from private insurance and Medicaid in some amount per administered shot as well.[14]  At the time, it appears the federal government would have provided all vaccinations to Ochsner at no charge,[15] meaning that Ochsner stood to realize significant profits from its vaccination efforts (in addition to any other advertising good will).

145.   By December 14, 2021 – just two weeks after the Pelicans/Saints constructively terminated Ms. Jewell's employment because she could not receive a COVID-19 vaccination – Ochsner publicly reported it had "administered 643,486 vaccine doses to eligible patients."

146.   In the context of all the facts of this case, even if the Pelicans/Saints did not terminate Ms. Jewell's employment because of disability or religious animus, Ms. Jewell alternatively alleges the Pelicans/Saints created a COVID-19 vaccination

---

[13] *See* "Medicare COVID-19 Vaccine Shot Payment" at https://www.cms.gov/medicare/covid-19/medicare-covid-19-vaccine-shot-payment

[14] *See* "Commercialization of COVID-19 Vaccines, Treatments, and Tests: Implications for Access and Coverage" at https://www.kff.org/coronavirus-covid-19/issue-brief/commercialization-of-covid-19-vaccines-treatments-and-tests-implications-for-access-and-coverage/

[15] *Id.*

policy that did not provide for any reasonable accommodation based on disability or religion, and refused to accommodate Ms. Jewell on these grounds, because management wanted to appease their corporate Healthcare sponsor, Ochsner Health, who at the time was engaged in a significant marketing and advertising campaign to administer the COVID-19 vaccination to as many Louianans as possible (either because of profit, good will, public health concerns, or other motives).  In other words, Ms. Jewell alleges Pelicans/Saints management refused to reasonably accommodate her in this case simply because management preferred to avoid any client-relation issues with Ochsner Health attendant to being Ochsner's public health sponsor, yet allowing unvaccinated employees to work for the Pelicans/Saints organization.

147.    Agreeing to reasonably accommodate Ms. Jewell's bona fide medical disability and religious objections to the Pelicans/Saints vaccination policy under these circumstances did not pose any undue hardship as a matter of law.  Refusing to reasonably accommodate Ms. Jewell under these circumstances was unlawful as a matter of law.

I.    **The Pelicans/Saints Apparently Never Required Sales Executives to Return to the Office until May 2022**

148.    Based on Ms. Jewell's personal knowledge and conversations with sales colleagues who remained employed by the Pelicans/Saints after her constructive termination, the Pelicans/Saints apparently never required any of its sales executives to return to work (versus teleworking) until approximately May 2022 – in other words about five or six months after management constructively terminated Ms. Jewell's employment.

149.   To the extent management did not require any of its sales executive staff to return to work until approximately May 2022, there is zero reason why management could not have permitted Ms. Jewell to continue to telework without receiving any COVID-19 vaccination until at least then (and, as discussed further below, by March 2022 the Pelicans/Saints apparently ended or significantly modified their workplace vaccination rule).  Any assertion by management otherwise is mere pretext to cover up their illegal discrimination.

## J.   At Least One Comparator Was Treated More Favorably under Identical Circumstances

150.   Moreover, to the best of her knowledge and understanding, Pelicans/Saints management permitted fellow sales executive C.G.,[16] a man, to work from home even after sales staff were recalled to the office because C.G.'s child was, actually, immunocompromised.  C.G. is a true comparator in this regard.  C.G held the same or similar job and title as Ms. Jewell.  C.G. apparently complied with management's COVID-19 vaccination policy and received at least one of the available COVID-19 vaccinations (otherwise he would have been terminated).  Even after all other sales staff were recalled to the office, management permitted C.G. to remain teleworking.

151.   Moreover, management's purported reason for accommodating C.G. was because his child was immunocompromised.  In contrast, management refused to accommodate Ms. Jewell because management (incorrectly) believed she was

---

[16] Because this is a public document, and because the pertinent facts involve the medical condition of C.G.'s minor son, plaintiff has chosen to use the man's initials to protect his and his child's identity.  Plaintiff will of course supply defendants with C.G.'s full name during discovery.

immunocompromised.

152.    In other words, the only apparent difference between management's better treatment of C.G. versus Ms. Jewell was that (1) Ms. Jewell was disabled, (2) Ms. Jewell held a religious objection to management's vaccination policy, and (3) Ms. Jewell asserted her rights under the ADA and Title VII for a reasonable accommodation to the policy.

153.    Based on these facts, Ms. Jewell alleges other comparators probably exist and will be found out during the discovery process of this case.

**K.    The Pelicans/Saints Invite Ms. Jewell to Return to Work but Refuse to Grant Her an Exemption from Management's Vaccination Rule**

154.    On March 4, 2022, Pelicans/Saints Human Resources Manager Kelly Stevenson emailed Ms. Jewell and wrote "the Company has determined that it is now safe for you to return to work."   Stevenson indicated that Ms. Jewell would be required to wear a facemask and socially distance when possible.   Stevenson asked that Ms. Jewell return to work as early as March 7.   Stevenson also indicated, however, that "our assessment of the situation is subject to change in the event there is a change in circumstances, including infection/transmission in the workplace, another surge in covid infections locally, and/or changes to the relevant guidance."  Stevenson did not reveal that, in fact, all sales executives were apparently still working from home, and had been doing so since Ms. Jewell had been constructively terminated.

155.    Ms. Jewell responded that she was interested in return to work, but asked several questions about the offer of reinstatement, including how management

arrived at its determination that it was "safe" for Ms. Jewell to return to work, and who would be responsible for determining whether Ms. Jewell would be placed an another, indefinite leave because of her vaccination status in the future.

156.   Stevenson responded by email that management's decision was based on the CDC's classification of the "COVID community levels for Orleans and Jefferson Parishes as 'Low.'" Stevenson admitted that the decision on whether to constructively terminate Ms. Jewell again in the future based on her vaccination status would be made "by the Human Resources Department, sometimes in consultation with legal counsel."  In other words, once again, management admitted that it refused to make any individualized, assessment of Ms. Jewell's circumstances based on her objective or reasonable medical information.

157.   Ms. Jewell responded by email on March 14.  Ms. Jewell explained that accepting reinstatement only to be constructively terminated again at any time based on her vaccination status would continue to cause significant disruption to her work and personal life, including (once again) loss of her book of client business, loss of income, and loss of her medical and other benefits.

158.   Ms. Jewell asked if management would be willing to commit that she would not be terminated again "because of the COVID pandemic so long as the CDC determines that the COVID-19 community level for Orleans and Jefferson Parishes remain 'low'?"  This was, of course, the exact same criteria that Stevenson had just revealed management used to determine it was "safe" for Ms. Jewell to return to work.

159.   Stevenson responded by email and indicated management refused to commit that management would not fire Ms. Jewell again because of her vaccination status even if the CDC's "community level" assessment of Orleans and Jefferson Parishes remained "low."   Stevenson only indicated that "if community levels in the area remain 'low,' it is our expectation that you will be working in the office."   Stevenson did not elaborate any further or give any explanation for why management might fire Ms. Jewell again because of her vaccination status even if the "community levels" of COVID-19 in Jefferson or Orleans Parishes remained "low."

160.   Stevenson likewise failed to acknowledge whether management was offering reinstatement as a "reasonable accommodation" to its vaccination rule, or if management had simply modified or ended its vaccination rule in a way that permitted Ms. Jewell to return to work.   In other words, the Pelicans/Saints made no commitment that it would end its disability and religious-based discrimination against Ms. Jewell even if she returned to work.

161.   On March 17, 2022, Ms. Jewell declined management's unreasonable offer. Ms. Jewell explained, in part:

> In other words, you've offered to let me return to work, but you've admitted the company might terminate me again tomorrow, next week, or next month based on the company's shifting attitudes towards the pandemic. When I asked if you would at least guarantee my employment so long as the CDC classified the community risk of COVID-19 in Orleans and Jefferson Parishes as "low," you again declined, despite you previously indicating that this was the metric the company relied upon in asking me to return to work in the first place.
>
> Ultimately, the company's offer essentially asks me to accept returning to work in an environment in which I am still actively discriminated against based on my religion and disability. As you have explained it, at

any time and apparently for any reason the company might terminate
me again based on my religion and disability.

162.   Stevenson responded by email on March 18, 2022.   Stevenson did not
substantively respond to any of Ms. Jewell's concerns.   Stevenson wrote that "We
disagree with many of the statements and characterizations in your email", but
Stevenson did not actually deny that management had discriminated against Ms.
Jewell based on her disability and religion, which in context was a tacit admission of
the fact.   Nor did Stevenson offer to commit that management would not terminate
Ms. Jewell again based on her vaccination status, even if "community levels" of
COVID-19 in Orleans and Jefferson Parishes remained low.

163.   Instead, Stevenson told Ms. Jewell that management would "proceed with
processing your termination of employment."

164.   The Pelicans/Saints constructively terminated Ms. Jewell's employment on
November 29, 2021 because of her disability, religion, protected activities, and
because management refused to grant her any reasonable accommodation to permit
her to continue working without first receiving a COVID-19 vaccination.   The
Pelicans/Saints apparently decided it was "safe" enough for Ms. Jewell to return to
work as of March 7, 2022 based on the CDC's determination that "community levels"
of COVID-19 in the Orleans and Jefferson Parishes were "low."   But the
Pelicans/Saints would neither grant Ms. Jewell a reasonable accommodation to their
vaccination policy, nor would they even commit to not firing Ms. Jewell again based
on her disability, religion, or vaccination status even if "community levels" remained
"low."   Management's decision-making in this regard is inexplicable and arbitrary on

its face.

165.   In reality, management's offer of reinstatement was mere pretext to try and gin up plausibility that it was justified in terminating Ms. Jewell's employment in November 2021 in the first place.  Because management admitted it might terminate Ms. Jewell again based on her vaccination status even if there were no change in circumstances, and based on management's refusal to at least acknowledge that Ms. Jewell was due a reasonable accommodation from management's COVID-19 vaccination policy, Ms. Jewell alleges that even if she had accepted management's offer of reinstatement, management would have simply fired her again for some other pretextual reason.  In other words, based on the facts of the case, Ms. Jewell alleges management never really offered her bona fide reinstatement at all – it was just pretext to try and avoid further liability in this case.

166.   No reasonable employee in Ms. Jewell's position would have returned to work under such untenable conditions.

## L.   The Pelicans/Saints Intentionally Discriminated and Retaliated against Ms. Jewell

167.   Based on the facts of the matter, Patrick McKinney, Kelly Stevenson, and all other Pelicans/Saints management officials involved in Ms. Jewell's termination decisions intentionally discriminated against her based on her disability, religion, and protected activities, and did so with malice or reckless indifference to her federally protected rights.

168.   At all times, McKinney, Stevenson, and all other responsible management officials acted against Ms. Jewell in the course and scope of their employment

authority, and the Pelicans/Saints are liable for management's discrimination.

## M.     The Aftermath

169.   Ms. Jewell suffered unemployment, loss of her income, and loss of her fringe benefits because of the Pelicans/Saints disability discrimination, religious discrimination, failure to accommodate, retaliation, and wrongful termination.

170.   Ms. Jewell has suffered significant mental anguish, emotional distress, and worsened or exacerbated physical sickness and injury because of the stress associated with the Pelicans/Saints disability discrimination, religious discrimination, failure to accommodate, retaliation, and wrongful termination.

171.   Ms. Jewell has suffered other compensatory and out-of-pocket damages because of the Pelicans/Saints disability discrimination, religious discrimination, failure to accommodate, retaliation, and wrongful termination.

## CAUSES OF ACTION

## A.     Wrongful Termination and Unlawful Disparate-Treatment Discrimination Based on Disability under the Americans with Disabilities Act against the Pelicans and the Saints

172.   Ms. Jewell states a cause of action for unlawful disparate treatment discrimination under the Americans with Disabilities Act against the Pelicans and the Saints.

173.   Pursuant to the ADA, an employer may not discriminate against an employee "on the basis of disability in regard to . . . [the] discharge of employees. . . ." 42 U.S.C. § 12112(a).  Although a plaintiff is not required to plead a prima facie case of discrimination at this stage of the proceeding, a plaintiff ultimately proves her prima

facie case by showing "(1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of her disability." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014). "Disability" means that the plaintiff "is disabled, has a record of having a disability, or is regarded as disabled." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).

174.   In the first instance, a plaintiff is "disabled" if she suffers from "a physical or mental impairment that substantially limits one or more major life activities of such individual."   42 U.S.C. § 12102(1).   Relevant here, an "impairment" is "[a]ny physiological . . . condition . . . affecting one or more body systems, such as . . . [the] immune [system.]" 29 C.F.R. § 1630.2(h)(1).  An impairment is substantially limiting when considering "the ability of an individual to perform a major life activity as compared to most people in the general population."   29 C.F.R. § 1630.2(j)(1)(ii). "Major life activities" include but are not limited to "walking . . . interacting with others . . . and working[.]" 29 C.F.R. § 1630.2(i)(1)(i).  An impairment is substantially limiting even if it is episodic in nature or in remission, if when the impairment is present it would be substantially limiting.   29 C.F.R. § 1630.2(j)(1)(vii).   The determination of whether an impairment is substantially limiting "is made without regard to the ameliorative effects of mitigating measures."   29 C.F.R. § 1630.2(j)(1)(vi).

175.  An employer also discriminates against a disabled employee when the employer refuses to "mak[e] reasonable accommodations to the known physical or

mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 442 (5th Cir. 2017) (citing 42 U.S.C. § 12112(b)(5)(A)).  An accommodation is reasonable unless it imposes "undue financial and administrative burdens" on the employer.  *See generally Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 n.17 (1987).  Reasonable accommodation specifically includes "job restructuring." 29 C.F.R. §1630.2(o)(2)(ii).  Likewise, an employer is required to engage in an "informal, interactive process" to determine "potential reasonable accommodations that could overcome those limitations."  29 C.F.R. §1630.2(o)(2)(iii).

176.  A private employer who discriminates against a disabled employee by terminating her employment is liable for the employee's resulting damages, including lost back wages, lost future wages, compensatory damages, litigation costs, reasonable attorney's fees, and equitable remedies including reinstatement and front pay.  An employer who does so intentionally or recklessly is also liable for punitive damages.

177.  Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

178.  The Pelicans/Saints discriminated against Ms. Jewell based on her disability. First, Ms. Jewell was disabled as a matter of law.  Ms. Jewell suffers from a rheumatological or other immunological disorder that, during an episode, causes her joints to significantly swell, discomfort, and difficulty walking.  At the time of her

termination in this case, Ms. Jewell had suffered from her condition for approximately two years.  Ms. Jewell still suffers from the condition today.

179.   Second, her disability prevented her from complying with the Pelicans/Saints COVID-19 vaccination mandate.   Multiple of Ms. Jewell's treating physicians, including Dr. Carin Sanchez, recommended Ms. Jewell abstain from receiving any COVID-19 vaccination (or any other vaccination) pending formal diagnosis and a treatment plan for Ms. Jewell's condition.

180.   Ms. Jewell timely gave notice of her disability and request for reasonable accommodation to her management through Vice-president of Human Resources Patrick McKinney.

181.   Ms. Jewell was an extraordinarily successful saleswoman for the Pelicans/Saints.  Her medical condition was easily accommodated and with zero financial or other burden to management.   Management lacked any legitimate business reason whatsoever to deny her accommodation.   Management's denial evinces their animus against Ms. Jewell based on her disability, or her record of disability, or because management regarded Ms. Jewell as more disabled than she really was.  Specifically, McKinney told Ms. Jewell management regarded her as "immunocompromised" despite being presented no evidence of that.  Based on the facts of the case, management constructively terminated Ms. Jewell's employment on November 29, 2021 based on her disability, and management has never offered Ms. Jewell reinstatement that any reasonable employee in her position would accepted.

182.   Likewise, for the same reasons, management constructively terminated Ms.

Jewell's employment because it refused to engage in the interactive process with her refused to reasonably accommodate her in any number of ways described throughout this lawsuit.  In particular, it appears management never even required account executives to return to work until May 2022, other than to periodically attend games to socialize with guests and remind them to keep their masks on.  Even then, management permitted Ms. Jewell to exclusively work from home based on complications she experienced during her pregnancy.  And it appears management permitted comparator C.G. to continue working from home beyond May 2022 because his child was, in fact, immunocompromised.  Management also permitted Ms. Jewell to attend games as a ***ticket holder*** throughout her employment.  All together, none of the accommodations proposed by Ms. Jewell would have caused the Pelicans/Saints any burden whatsoever, including submitting to periodic COVID-19 testing at her own expense and the use of approved face coverings like N95 masks.  In reality, and whether based on disability animus or a desire to appease the Pelicans/Saints Healthcare sponsor, Ochsner Health, management refused to reasonably accommodate Ms. Jewell not because of any undue burden, but rather because management simply did not want to.

183.   Accordingly, the Pelicans and Saints owe Ms. Jewell all damages arising from their unlawful discrimination, including Ms. Jewell's lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

**B.    Wrongful    Termination    and    Unlawful    Disparate-Treatment Discrimination Based on Religion under Title VII against the Pelicans and the Saints**

184.    Ms. Jewell states a cause of action for unlawful disparate treatment discrimination under Title VII against the Pelicans and the Saints.

185.    Under Title VII, an employer illegally discriminates against and terminates an employee when the decision is "because of" the worker's religion.  42 U.S.C. §2000e-2(a)(1).

186.    An employer also illegally terminates an employee when the decision "was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m); *accord Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005) (so holding).

187.    "Religion" includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

188.    Accordingly, Title VII makes it "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees."  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977).  Although a plaintiff is not required to plead a prima facie case at this stage of the proceeding, a plaintiff eventually proves a prima facie case for failure-to-accommodate discrimination by showing "(1) that he had a bona fide religious belief that conflicted with an employment requirement; (2)

that he informed the employer of his belief; and (3) that he was discharged for failing to comply with the conflicting employment requirement." *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013).  Once the plaintiff proves a prima facie case, "the burden shifts to the defendant to demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship." *Id.*  Current decisional law holds a proposed accommodation is unreasonable "when an employer is required to bear more than a de minimis cost." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 487 (5th Cir. 2014); *accord Hardison*, 432 U.S. at 84.

189.    A private employer who discriminates against an employee in violation of Title VII is liable for the employee's lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

190.    Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

191.    Ms. Jewell held a sincere religious objection to the Pelicans/Saints COVID-19 vaccination rule.  The Pelicans/Saints never disputed the sincerity of her beliefs. Patrick McKinney instead told Ms. Jewell that management refused to accommodate her objection because of safety concerns.  Those concerns, as alleged at length in this lawsuit, were pretext for discrimination, and at the very least objectively unreasonable and completely uninformed by any medical evidence pertaining to Ms. Jewell's circumstances.

192.   In contrast, Ms. Jewell was an extraordinarily successful saleswoman for the Pelicans/Saints.   Her religious objection was easily accommodated as described throughout this lawsuit, and those proposed accommodations would have caused the Pelicans/Saints zero financial burden, safety risk, or inconvenience whatsoever. Based on the facts of the case, management constructively terminated Ms. Jewell's employment on November 29, 2021 based on her religion and religious beliefs, and because management refused to accommodate her religious objection, and management has never offered Ms. Jewell reinstatement that any reasonable employee in her position would accepted.

193.   Accordingly, the Pelicans and Saints owe Ms. Jewell all damages arising from their unlawful discrimination, including Ms. Jewell's lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

194.   Finally, in the alternative, if the Court were to find that a proposed accommodation that would have permitted Ms. Jewell to continue working was nevertheless "unreasonable" because it imposed something more than "de minimis" burden on the Pelicans/Saints, Ms. Jewell alleges the proper standard to evaluate a reasonable accommodation claim in a Title VII religious objection case is akin to the standard currently applicable in disability claims under the ADAAA – that is to say, an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause the employer significant difficulty or expense.   *See* 29 C.F.R. § 1630.2.   Plaintiff alleges the "de minimus" standard

currently applicable to Title VII religious objection cases is inconsistent with the statutory text of 42 U.S.C. § 2000e(j) and its meaning and should be overturned. Plaintiff likewise alternatively alleges that the Pelicans/Saints were obligated to extend to Ms. Jewell any reasonable accommodation from its COVID-19 vaccination policy on account of her religious objection that it afforded to any other employee for any other reason.  *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015) ("But Title VII does not demand mere neutrality with regard to religious practices – that they be treated no worse than other practices.  Rather, it gives them favored treatment . . . Title VII requires otherwise-neutral policies to give way to the need for an accommodation").

## C.  Wrongful Termination and Unlawful Disparate-Treatment Retaliation Based on Protected Activities under the ADA against the Pelicans and the Saints

195.   Ms. Jewell states a cause of action for unlawful disparate treatment retaliation under the ADA against the Pelicans and the Saints.

196.   An employer may not retaliate against an employee for engaging in protected activity under the Americans with Disabilities Act.  In the Fifth Circuit, "[i]t is undisputed that making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity."  *Tabatchnik v. Cont'l Airlines*, 262 Fed. Appx. 674, 676 (5th Cir. 2008).  Although not required to state a prima facie case at this stage of the proceeding, a plaintiff eventually proves a prima facie case of retaliation by showing that "(1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a

causal connection exists between the protected activity and the adverse action." *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

197.   Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

198.   During Ms. Jewell's October 6, 2021 phone call with Patrick McKinney and Mary Vinet, McKinney at least displayed some willingness to extend the time period for Ms. Jewell to receive any COVID-19 vaccination.  On October 28, 2021, Ms. Jewell through counsel requested reasonable accommodation from management based on her medical disability and religious objection under the ADA and Title VII. Management gave Ms. Jewell notice of her constructive termination about three weeks later on November 19, 2021, and that constructive termination became effective on November 29.

199.   This appears overtly retaliatory given that the Pelicans/Saints management did not require any of its sales executives to return to the workplace until around May 2022, and likewise accommodated comparator C.G. by allowing him to continue teleworking from home because his child was, apparently, immunocompromised.

200.   In addition or in the alternative to any other allegation in this lawsuit, and based on the facts of the case, Ms. Jewell alleges management constructively terminated her employment on November 29, 2021 in retaliation against her because she engaged in protected activities, including but not limited to requesting reasonable accommodation, and management has never offered Ms. Jewell reinstatement that

any reasonable employee in her position would accepted.

1201.  Accordingly, the Pelicans and Saints owe Ms. Jewell all damages arising from their unlawful retaliation, including Ms. Jewell's lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

**D.    Wrongful Termination and Unlawful Disparate-Treatment Retaliation Based on Protected Activities under Title VII against the Pelicans and the Saints**

202.  Ms. Jewell states a cause of action for unlawful disparate treatment retaliation under Title VII against the Pelicans and the Saints.

203.  Under Title VII, an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice under [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].  42 U.S.C. §2000e-3(a).  In a retaliation case, "an adverse employment action is one that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006)).  "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).

204.   Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

205.   For all the reasons stated throughout this complaint applicable to plaintiff's claims of retaliation under the ADA, Ms. Jewell alleges management constructively terminated her employment on November 29, 2021 in retaliation against her because she engaged in protected activities, including but not limited to requesting reasonable accommodation, and management has never offered Ms. Jewell reinstatement that any reasonable employee in her position would accepted.

206.   Accordingly, the Pelicans and Saints owe Ms. Jewell all damages arising from their unlawful discrimination, including Ms. Jewell's lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

## E.   Unlawful Disparate Treatment Discrimination Based on Disability under the Louisiana Employment Discrimination Law against the Pelicans and the Saints

207.   Ms. Jewell states a cause of action of unlawful disparate treatment discrimination based on disability under the Louisiana Employment Discrimination Law against the Pelicans and Saints.

208.   Under the LEDL, no employer may discriminate against an employee based on her disability.   La. Rev. Stat. Ann. § 23:323 *et seq*.   Louisiana's anti-disability-discrimination statute is modeled after the ADA, and therefore analysis of the two statutes are functionally identical.   *See e.g., Stewart v. Smitty's Supply, Inc.*, CV 18-10058, 2020 WL 433362 at *9 (E.D. La. Jan. 28, 2020).

209.   Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

210.   Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims of unlawful disparate treatment discrimination under the Americans with Disabilities Act against the Pelicans and the Saints, the Pelicans and the Saints are liable to Ms. Jewell for all her damages arising from management's unlawful discrimination, including lost back wages, lost future wages, reinstatement, compensatory damages, litigation costs, and reasonable attorney's fees.

## F.   Unlawful Disparate Treatment Discrimination Based on Religion under the Louisiana Employment Discrimination Law against the Pelicans and the Saints

211.   Ms. Jewell states a cause of action of unlawful disparate treatment retaliation under the Louisiana Employment Discrimination Law against the Pelicans and Saints.

212.   Under the LEDL, no employer may discriminate against an employee based on his religion.  La. Rev. Stat. Ann. § 23:332 *et seq*.

213.   Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

214.   Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims of unlawful disparate treatment discrimination under Title VII against the Pelicans and the Saints, the Pelicans and the Saints are liable to Ms. Jewell for all her damages arising from

management's unlawful discrimination, including lost back wages, lost future wages, reinstatement, compensatory damages, litigation costs, and reasonable attorney's fees.

### G. Unlawful Disparate Treatment Retaliation Because of Protected Activities under the Louisiana Employment Discrimination Law against the Pelicans and the Saints

215.   Ms. Jewell states a cause of action of unlawful disparate treatment retaliation under the Louisiana Employment Discrimination Law against the Pelicans and Saints.

216.   Under La. Rev. Stat. Ann. § 51:2256 *et seq*., no employer may "retaliate . . . in any manner against a person because he has opposed a practice declared unlawful under [the LEDL]."

217.   Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

218.   Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims of unlawful disparate treatment retaliation under both the ADA and Title VII against the Pelicans and the Saints, the Pelicans and the Saints are liable to Ms. Jewell for all her damages arising from management's unlawful retaliation, including lost back wages, lost future wages, reinstatement, compensatory damages, litigation costs, and reasonable attorney's fees.

### JURY DEMAND

Ms. Jewell requests a trial by jury on all issues and causes of action.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Amanda Jewell prays that this complaint be deemed good and sufficient; that it and summons be served upon defendants New Orleans Pelicans NBA, LLC and New Orleans Louisiana Saints, LLC; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant:

1. Under all causes of action, the entry of a declaratory judgment in favor of Ms. Jewell and against all defendants declaring that the practices complained of in this complaint are unlawful under federal and state law and all defendants willfully, maliciously, or recklessly as the case may be violated the rights of Ms. Jewell as alleged and proven.

2. Under the ADA and Title VII, awarding Ms. Jewell all damages and equitable relief due against all defendants, including but not limited to back pay, front pay or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs.

3. Under the LEDL, awarding Ms. Jewell all damages and equitable relief due against all defendants, including but not limited to back pay, front pay or reinstatement, compensatory damages, and reasonable attorney's fees and costs.

4. Under all causes of action, awarding all other legal or equitable relief to which plaintiff is due against all defendants.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone: (504) 275-5149
Facsimile: (504) 910-1704
Email: vogeltanz@gmail.com

*Attorney for plaintiff Amanda Jewell*

**Clerk of Court: please hold summons pending attempt to secure waiver of service**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **AMANDA JEWELL** | |
| **Plaintiff,** | |
| **v.** | **CIVIL NO. PENDING** |
| **NEW ORLEANS PELICANS NBA, LLC and NEW ORLEANS LOUISIANA SAINTS, LLC** | |
| **Defendants.** | |

## <u>DECLARATION OF AMANDA JEWELL</u>

I, Amanda Jewell, am 36 years old, and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following facts and true and correct to the best of my knowledge and recollection:

1.      I am the named plaintiff in the federal lawsuit *Amanda Jewell v. New Orleans Pelicans NBA, LLC et al.*, soon to be filed in the United States District Court for the Eastern District of Louisiana.

2.      After reviewing the entire document, I authorized and instructed my attorney, Kevin S. Vogeltanz, to file the original Complaint in this matter and to assert all of the causes of action included therein.

3.    I verify that, at the time of its filing, each of the factual allegations of the Complaint was true and correct to the best of my knowledge and recollection.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.  Executed on _____2/20/2023_____.

DocuSigned by:

*Amanda Jewell*

0B173313FBB446B...

Amanda Jewell